IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                          PLAINTIFF

VS.                    Case No. 2:16-cr-20008-PKH-MEF-1

DAVID HURL LEMMON                                                 DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 208) filed on September 24, 2019. The Government filed its response (ECF No. 212) on October 25, 2019, together with affidavits of trial counsel (ECF No. 212-1), sentencing counsel (ECF No. 212-2), and appellate counsel (ECF No. 212-3). Defendant filed a reply (ECF No. 217) on December 12, 2019, along with a supporting affidavit (ECF No. 217-1). After several continuances, some Covid-19 related, an evidentiary hearing was held on December 8, 2021. (ECF No. 259). The matter is ready for report and recommendation.

## I.      BACKGROUND

On March 16, 2016, an Indictment was filed against Defendant, David Hurl Lemmon ("Lemmon"), alleging that from at least January 15, 2016, through January 23, 2016, Lemmon engaged in a conspiracy to distribute a mixture or substance that contained a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. (ECF No. 1). Lemmon was arrested on March 29, 2016 (ECF No. 24), and he appeared for arraignment on March 30, 2016, at which time J. Marvin Honeycutt ("Honeycutt"), a Criminal Justice Act ("CJA") Panel attorney, was appointed and Lemmon entered a not guilty

plea to the Indictment. (ECF Nos. 12, 14). Lemmon waived the issue of detention and was remanded to the custody of the U. S. Marshal Service. (ECF Nos. 12, 15). Honeycutt requested discovery in open court. (ECF No. 12).

On April 21, 2016, retained counsel, John Wesley Hall, Jr. ("Hall"), entered his appearance on behalf of Lemmon and moved for substitution of counsel. (ECF Nos. 25, 26). Honeycutt moved to withdraw the next day (ECF No. 27), and the Court granted his motion.

On October 5, 2016, Lemmon was named in a Superseding Indictment charging him with: Count One, engaging in a conspiracy to distribute a mixture or substance that contained a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, involving a quantity of 50 grams or more of methamphetamine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A)(viii); and, Count Two, being a felon in possession of one or more firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 77). Lemmon appeared with his retained counsel for arraignment on October 12, 2016, at which time he entered a not guilty plea to the Superseding Indictment. (ECF No. 88).

On November 3, 2016, Hall filed a motion to suppress evidence seized in a search of Lemmon's home. (ECF No. 98). An Opinion and Order denying the motion to suppress was entered on November 17, 2016. (ECF No. 104).

A jury trial was held on December 13-15, 2016. (ECF Nos. 124-126). After the Government rested its case-in-chief, Hall made a Rule 29 motion for acquittal, which was denied by the Court. (ECF No. 126, p. 1). Lemmon advised the Court of his decision not to testify and the defense rested without calling any witnesses. (*Id*.). Hall renewed his Rule 29 motion for

acquittal, and it was again denied by the Court. (*Id.*). After deliberating approximately one hour 48 minutes on December 15, 2016, the jury returned verdicts finding Lemmon guilty of both counts charged in the Superseding Indictment. (ECF No. 126, p. 2; ECF No. 127).

On January 10, 2017, the Court received a letter from Lemmon, which he characterized as a "Motion for judgement of Acquittal or Re-trial," alleging in part "misrepresentation" by Hall. (ECF No. 134). A motion to withdraw was filed by Hall the next day. (ECF No. 135). A hearing was held on January 26, 2017, and Hall's motion to withdraw was granted. (ECF Nos. 138, 140). Lemmon's request for appointment of counsel was granted, and Tyler H. Benson ("Benson"), a CJA Panel attorney, was appointed to represent Lemmon. (ECF No. 138; Text Only Order entered January 26, 2017).

An initial Presentence Investigation Report ("PSR") was prepared by the United States Probation Office on April 3, 2017. (ECF No. 146).

On April 7, 2017, the Government advised it had four objections to the initial PSR, and it added a point of clarification concerning Lemmon's status as either an armed career criminal or a career offender. (ECF No. 153). The Government's first objection requested that three state court convictions on November 21, 2001, be added to Lemmon's reported criminal history. (*Id.*, ¶ 1). A second objection sought the addition of three criminal history points related to a November 2005 conviction. (*Id.*, ¶ 2). The Government's third objection sought the addition of three criminal history points for the November 21, 2001, state court convictions. (*Id.*, ¶ 3). Based on these additions to Lemmon's reported criminal history, the Government's fourth objection sought to correct Lemmon's criminal history score to 21. (*Id.*, ¶ 4). While agreeing with the finding in Paragraph 122 of the PSR that Lemmon is an armed career criminal, the Government sought to

clarify that if the Court were to determine that one of Lemmon's three qualifying convictions does not constitute either a "violent felony" or a "serious drug offense" as defined in 18 U.S.C. § 924(e), it was the Government's position that Lemmon is a career offender pursuant to U.S.S.G. § 4B1.1(a). (*Id.*, ¶ 5).

On April 13, 2017, Benson filed a response to the initial PSR on Lemmon's behalf raising numerous objections. (ECF No. 155). Due to the numerous objections, the Probation Officer organized the objections in relation to the specific sections of the PSR. (ECF No. 156-1, p. 2).

For Lemmon's first category of objections, regarding the *Charges and Convictions* section of the PSR (Paragraphs 1-7), Lemmon admitted he was named in the charging documents, but he denied the truthfulness of the allegations against him. The Probation Officer believed Paragraphs 1-7 of the PSR were accurate and that no changes were warranted. (*Id.*).

Lemmon's second objection concerned the *Codefendant Cases* section of the PSR (Paragraphs 16-20). Stating that he was without sufficient knowledge to form a response, Lemmon objected to Paragraphs 16-20. The Probation Officer believed Paragraphs 16-20 of the PSR were accurate and that no changes were warranted. (*Id.*, pp. 2-3).

For his third category of objections, Lemmon objected to each material allegation set forth in the *Offense Conduct* section of the PSR (Paragraphs 22-78). (*Id.*, p. 3). Noting that a jury convicted Lemmon based on the information contained in the *Offense Conduct* section, the Probation Officer reported that no changes were warranted. (*Id.*).

Lemmon's fourth objection was to the *Offense Level Computation* section of the PSR (Paragraphs 84-87, 89-92, and 96-100). (*Id.*). Lemmon objected to all of it. The Probation Officer reported that the offense level had been correctly calculated and that no changes were warranted.

(*Id*.).

Lemmon's fifth objection concerned the *Criminal History Computation* section of the PSR (Paragraphs 119-122 of the initial PSR; Paragraphs 122-125 of the final PSR). (*Id*.). Again, Lemmon objected to every paragraph in this section, and he reiterated his allegation that "he did not commit this offense." The Probation Officer responded by stating that Lemmon's criminal history score had been correctly calculated, therefore, no changes were warranted. (*Id*.).

Lemmon's sixth objection stated that he was never legally married to Christy Foerster, and that Foerster was not incarcerated and resided in Fort Smith, Arkansas. The Probation Officer made a revision in the final PSR. (*Id*.). His seventh objection admitted the accuracy of Paragraph 150 of the PSR, but he wanted it reported that he owes Kubota Tractor Company a total of $19,000. The Probation Officer revised the paragraph to reflect that information. (*Id*.).

Lemmon next objected to the PSR's report that he was not eligible for probation because his counts of conviction are Class A felonies and statutory limitations exist. The Probation Officer responded that Paragraph 162 is accurate and that no change was warranted. (*Id*.).

Lemmon's ninth and final objection related to the PSR's report that no factors were identified to warrant either a departure from the applicable guidelines range or a sentence outside of the advisory guideline system (Paragraphs 172-173 of the initial PSR; Paragraphs 175-176 of the final PSR). (*Id*.). Lemmon offered no specific factors in support of this objection. The Probation Officer noted that Paragraph 175 was accurate and no change warranted; but, Paragraph 176 was modified to reflect that because the meth was tested for purity, Lemmon is accountable under the guidelines for the weight of the actual meth, which resulted in a two-level increase in the total offense level from it would have been if law enforcement had decided not to test the purity

of the meth, and the end result would presumably be a guideline imprisonment range of 360 months to life. (*Id*., p. 4).

On April 18, 2017, a final PSR was submitted to the Court. (ECF No. 156).

For purposes of guideline calculation as to Count One, Lemmon was determined to be accountable for 21.82 kilograms of actual methamphetamine. (ECF No. 156, ¶ 76). Pursuant to U.S.S.G. § 2D1.1(c)(1), this drug quantity called for a base offense level of 38. (*Id*., ¶ 84). A two-level enhancement was applied under U.S.S.G. § 2D1.1(b)(1) as Lemmon possessed a dangerous weapon. (*Id*., ¶ 85). A three-level enhancement was applied under U.S.S.G. § 3B1.1(b) because Lemmon was a manager or supervisor of criminal activity that involved five or more participants. Application of the enhancements resulted in an adjusted offense level of 43 for Count One. Regarding Count Two, Lemmon possessed seven firearms after sustaining at least one felony conviction for a controlled substance offense; he also possessed the firearms in connection with another felony offense; further, he possessed the firearms after sustaining at least three felony convictions, one for a controlled substance offense and two for violent felonies, so Lemmon was subject to the Armed Career Criminal Act ("ACCA") enhancement under 18 U.S.C. § 924(e)(1). (*Id*., ¶ 78).

Pursuant to U.S.S.G. § 2K2.1(a)(2)(A), Lemmon's Count Two conduct resulted in a base offense level of 20. (*Id*., ¶ 90). Since the offense involved seven firearms, a two-level enhancement applied under U.S.S.G. § 2K2.1(b)(1)(A). (*Id*., ¶ 91). A four-level enhancement applied under U.S.S.G. § 2K2.1(b)(1)(A) because Lemmon used or possessed a firearm or ammunition in connection with another felony offense. (*Id*., ¶ 92). The resulting adjusted offense level for Count Two was 26.

U.S.S.G. § 3D1.3(b) advises use of the greater adjusted offense level, which for Lemmon was 43. (*Id.*, ¶¶ 83, 97). No reduction for acceptance of responsibility applied. (*Id.*, ¶ 99). As Lemmon's adjusted offense level of 43 was the greatest of the four choices available under U.S.S.G. § 4B1.4(b) for an armed career criminal, Lemmon's total offense level was determined to be 43. (*Id.*, ¶¶ 98, 100).

Lemmon's lengthy criminal history, beginning at age 18, resulted in a criminal history score of 17, placing him in criminal history category VI. (*Id.*, ¶¶ 104-122). Lemmon committed the instant offenses while on parole, so two additional criminal history points were assessed under U.S.S.G. § 4A1.1(d), resulting in a total criminal history score of 19 and placing him in criminal history category VI. (*Id.*, ¶¶ 123, 124). Further, pursuant to U.S.S.G. § 4B1.4(c), the criminal history category is VI because Lemmon is an armed career criminal. (*Id.*, ¶ 125). For Count One (conspiracy to distribute methamphetamine), the statutory minimum term of imprisonment is 10 years, and the maximum term is life imprisonment. 21 U.S.C. § 841(b)(1)(A)(viii). For Count Two (felon in possession of firearm), the statutory minimum term of imprisonment is 15 years, and the maximum term is life imprisonment. 18 U.S.C. § 924(e)(1). (*Id.*, ¶ 153). Based upon a total offense level of 43 and a criminal history category of VI, Lemmon's advisory Guidelines range was determined to be life imprisonment. (*Id.*, ¶ 154).

A Sentencing Memorandum was filed by Benson on Lemmon's behalf on May 31, 2017. (ECF No. 161). In it, Benson sought a downward variance from the advisory Guidelines range of life imprisonment, arguing that Lemmon's characteristics, including his history of drug abuse, mitigated against a sentence of life imprisonment. (*Id.*, p. 4). Benson also argued that the disparity between Lemmon's prior state court sentences and the advisory Guidelines range of life

imprisonment supported a downward variance, suggesting that a sentence of 20 years would adequately serve the purposes of sentencing. (*Id.*, pp. 4-6).

Lemmon appeared for sentencing on June 21, 2017. (ECF No. 174). When asked if Lemmon was satisfied with his counsel, Mr. Benson, Lemmon stated, "[n]ot really, no." (ECF No. 192-2, p. 531). The Court advised Lemmon that any ineffective assistance of counsel claims he may have must be brought in a proceeding for post-conviction relief under 28 U.S.C. § 2255. (*Id.*, pp. 531-32). Lemmon acknowledged having reviewed the initial PSR, but he told the Court he had not seen the final PSR. (*Id.*, pp. 532-33). Upon inquiry, Benson informed the Court that he did go over the final PSR with Lemmon, stating ". . . it was the second Report that I viewed with him after the revisions were made." (*Id.*, p. 533).

Noting that Lemmon's objections to the PSR had been grouped into nine categories, the Court determined that Lemmon's third objection (to the offense conduct), fourth objection (to the offense level calculation), and fifth objection (to the criminal history calculation) remained outstanding. (*Id.*, p. 534). Finding these objections vague and lacking in any legal or factual basis to support them, the Court found that sufficient testimony was presented at trial to meet the government's preponderance of the evidence burden as to the facts set forth in the offense conduct section of the PSR, and the Court further found that the offense level and criminal history calculations were correct. (*Id.*, pp. 535, 539).

Having resolved all objections to the PSR, and adopting the PSR without changes, the Court set forth the statutory penalties applicable to the counts of conviction. (*Id.*, pp. 539-40). In determining the applicable Guidelines range, the Court noted U.S.S.G. § 3D1.3(b) requires use of the highest offense level, which the Court found to be the offense level of 43 for Count One. (*Id.*,

p. 541). Lemmon was found to have 19 criminal history points, placing him in criminal history category VI. (*Id*., p. 542). Therefore, the Court determined that the advisory Guidelines range was life imprisonment; a term of supervised release of five years for Count One, and two to five years on Count Two; a fine in the range of $50,000 to $10,250,000; and mandatory special assessments totaling $200. (*Id*.).

The Court announced that in determining what sentence to impose, it would follow the factors set forth in 18 U.S.C. § 3553(a). (*Id*., p. 542). It noted Benson's Sentencing Memorandum arguing for a downward variance, and it noted the government had likewise filed a Sentencing Memorandum. (*Id*., p. 543). The Court acknowledged that it received two letters of support on behalf of Lemmon, which it had read and taken into consideration. (*Id*.). The Court heard the Government's statement regarding the sentence it believed should be imposed – an "immeasurable sentence" equal to the "immeasurable" impact of Lemmon's crimes on "this area and its citizens." (*Id*., p. 549).

The Court also heard Benson's argument asking the Court to "vary from the Guideline range of life in prison to give [Lemmon] a term of months . . .." (*Id*.). Benson referred to his Sentencing Memorandum's discussion of *United States v. Amaya*, 949 F.Supp.2d 895 (N.D. Iowa 2013), in which the court varied from a life sentence based on the disparity between the defendant's previous sentences and the Guideline range. (*Id*., p. 550). Benson argued that Lemmon's longest period of continual custody was approximately five years beginning in 1992, at which time Lemmon was 18 years old; that none of the subsequent terms of imprisonment were longer than five years; and none of them were anywhere close to life in prison. Benson next referenced his Sentencing Memorandum's discussion of *United States v. Deegan*, 605 F.3d 625, 657 (8th Cir.

2010), in which Judge Bright in a dissenting opinion observed that harsh federal punishment when compared to lenient state sentencing for the same criminal activity "promotes disrespect for the law and the judicial system." (*Id*.). Benson pointed out that Lemmon had served relatively short sentences for conspiracy to deliver methamphetamine in state court, compared to the harsh federal sentence of life in prison for the same charge. The Court, however, noted that the difference was based on the quantities of methamphetamine. Next, Benson pointed out that Lemmon was 44 years old, lacked a high school education, and had well-documented drug addictions. Benson argued that a fair sentence would allow Lemmon to get vocational training, receive his GED, receive treatment for past drug abuse, and ultimately correct him to become a productive member of society. Benson argued that Lemmon's experience as a small business owner exhibited potential to be reintegrated into society one day. (*Id*., p. 551). Finally, Benson requested that the Court vary downward from the Guideline range of life imprisonment and sentence to Lemmon to a term of months. (*Id*., p. 552). The Court also heard a statement from Lemmon in which he asked for leniency. (*Id*.).

The Court noted the conspiracy in this case reached back to 2014, involved many firearms and the largest quantities of methamphetamine the Court had seen. (*Id*., pp. 553-554). The Court also considered Lemmon's history and characteristics, noting his extensive criminal record with drug-related convictions, substance abuse problems, and lack of education, but experience running a small business. (*Id*., p. 554). Under the factors of § 3553(a), the Court concluded that it needed to impose a sentence that was sufficient but not greater than necessary to comply with the goals of the Sentencing Guidelines. (*Id*., p. 555). Despite the Government's argument for a Guideline sentence of life, the Court believed a term of years or months was a more appropriate way to

comply with the § 3553(a) factors, which required the Court to vary downward from the Guidelines. (*Id*.). The Court reasoned that while the offenses certainly raised the possibility for violence, there was no violence, and the Court believed a life sentence ought to be reserved for those cases in which there was violence or harm to an individual. (*Id*.). Therefore, the Court did not believe a life sentence was appropriate. (*Id*., pp. 555-556). This reasoning was also set forth in the Court's Statement of Reasons filed on June 22, 2017. (ECF No. 178, § VIII).

The Court imposed a sentence of 420 months imprisonment on Count One (conspiracy to distribute methamphetamine) and 180 months imprisonment on Count Two (felon in possession of a firearm), to run concurrently. Five years supervised release was imposed on each count, to run concurrently; no fine was imposed; no restitution was ordered; and a total of $200 in special assessments was imposed. (*Id*., pp. 556-557). Judgment was entered by the Court on June 22, 2017. (ECF No. 177).

Lemmon filed a handwritten notice of appeal on his own behalf on June 29, 2017. (ECF No. 184). On June 30, 2017, the Eighth Circuit Court of Appeals entered an Order appointing Benson to represent Lemmon in his appeal. (ECF No. 187). On July 20, 2017, the Eighth Circuit denied Benson's motion for leave to withdraw as counsel for Lemmon (ECF No. 191); but, on August 7, 2017, the Eighth Circuit considered and granted Lemmon's motion for appointment of new counsel, and attorney Sammi Wilmoth ("Wilmoth") was appointed to represent Lemmon on appeal. (ECF No. 194).

On May 3, 2018, the Eighth Circuit ordered and adjudged that the judgment of the district court be affirmed. (ECF No. 202-1). The Court considered Lemmon's three arguments on appeal: (1) that the eyewitness testimony connecting him to the conspiracy is not credible and that the

circumstantial evidence against him is inconclusive; (2) that he cannot be convicted of being a felon in possession of a firearm because the firearms found at his house belonged to his girlfriend; and (3) that his 420 month sentence is substantively unreasonable because the "sentence is greater than necessary to comply with the purposes set forth in [the U.S. Sentencing Guidelines (Guidelines)]." (ECF No. 202-2, p. 2-3). Under *United States v. Coleman*, 525 F.3d 665, 666 (8th Cir. 2008) (upholding jury verdicts based solely on the testimony of co-conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony), the Eighth Circuit upheld the conviction regarding Lemmon's first argument. (*Id.*, p. 2). Under *United States v. Ways*, 832 F.3d 887, 897 (8th Cir. 2016) (finding constructive possession of a firearm where the government proves that a defendant had both knowledge that the firearm was present and dominion over the premises where the contraband was located), the Eighth Circuit noted that the jury heard testimony that Lemmon and his girlfriend were the only adults of the house and that law enforcement discovered a .40 caliber pistol in the master bedroom closet of Lemmon's residence where both men's and women's clothing was present. Citing the standard of review in *United States v. Jirak*, 728 F.3d 806, 811 (8th Cir. 2013), the Eighth Circuit found that the jury could reasonably infer that Lemmon had knowledge of the firearm and dominion over the location where the firearm was located. (*Id.*, p. 2-3). Finally, citing *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (standard of review), the Eighth Circuit noted that the district court carefully considered the relevant Guidelines and varied downward from the advisory Guidelines' sentence of life imprisonment. Thus, the Eighth Circuit concluded that the district court did not abuse its discretion in imposing its sentence. (*Id.*, p. 3).

Lemmon filed a Motion to Compel discovery for the purpose of filing a motion under 28 U.S.C. § 2255 on November 2, 2018. (ECF No. 203). The Government filed its response in opposition on November 14, 2018. (ECF No. 204). Noting that a habeas petitioner is not entitled to discovery until his § 2255 petition has been filed, and that Lemmon had not yet filed any § 2255 petition, the Court denied Lemmon's Motion to Compel on November 19, 2018. (ECF No. 205).

On September 24, 2019, retained attorney Joseph Self ("Self") entered his appearance for Lemmon (ECF No. 207) and simultaneously filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 208) (the "motion") and a Memorandum of Law in Support of Motion to Vacate, Set Aside, or Correct Sentence (ECF No. 209).

The motion asserts ineffective assistance of counsel at trial, at sentencing, and on appeal based on *Strickland v. Washington*, 466 U.S. 668 (1984). (ECF No. 209, pp. 1-3). More specifically, Lemmon contends that Hall's representation was inadequate due to Hall's failure to investigate and failure to prepare a defense. (*Id.*, pp. 2-3). While Lemmon also presents arguments regarding his representation at sentencing and on appeal, he asserts that those arguments would be rendered moot by a finding that he did not receive adequate representation at trial. (*Id.*, p. 3).

On October 25, 2019, the Government filed its response (ECF No. 212), with three attachments: (1) Exhibit A – Affidavit of John Wesley Hall (ECF No. 212-1); (2) Exhibit B – Affidavit of Tyler H. Benson (ECF No. 212-2); and (3) Exhibit C – Affidavit of Sammi Wilmoth (ECF No. 212-3). The Government first asserts that Lemmon's motion was untimely under *Clay v. United States*, 537 U.S. 522, 524-25 (2003), because it was filed more than one year after his conviction became final on September 19, 2018. The Government also contends that equitable

tolling does not apply to Lemmon's motion because his attorney's negligence or mistake did not constitute an extraordinary circumstance justifying equitable tolling under *Byers v. United States*, 561 F.3d 832, 836 (8th Cir. 2009). In addition, the Government asserts that Lemmon's allegations against his trial counsel, sentencing counsel, and appellate counsel are all without merit and should be dismissed. (ECF No. 212, pp. 11-31).

On February 24, 2020, the undersigned ordered and scheduled an evidentiary hearing for May 21, 2020. (ECF Nos. 220, 221). The evidentiary hearing was continued and reset for July 21, 2020, due to the onset of the COVID-19 pandemic. (ECF No. 224).

On May 27, 2020, attorney Self filed a motion to withdraw as Lemmon's counsel. (ECF No. 227). A hearing on the motion to withdraw was held via video conference on June 8, 2020, and the undersigned granted Self's motion to withdraw on June 9, 2020. (ECF Nos. 228, 229). The Court appoint Assistant Federal Public Defender ("AFPD") James B. Pierce ("Pierce") to represent Lemmon. (ECF No. 230). An unopposed motion to continue the evidentiary hearing was granted on June 19, 2020, and the evidentiary hearing was rescheduled on January 11, 2021. (ECF Nos. 231, 232). On November 25, 2020, the evidentiary hearing was again continued and reset on February 26, 2021. (ECF No. 234).

On February 17, 2021, AFPD Pierce filed his motion to withdraw as Lemmon's counsel. (ECF No. 243). A video conference hearing on AFPD Pierce's motion to withdraw was held on February 22, 2021 (ECF No. 247), and Pierce was granted leave to withdraw. (ECF No. 248). The Court then appointed attorney Aubrey L. Barr, a CJA Panel attorney, to represent Lemmon. (ECF No. 249). The evidentiary hearing on Lemmon's § 2255 Motion was rescheduled for September 16, 2021. (ECF No. 250). On September 1, 2021, having tested positive for COVID-

19, Barr moved for a continuance of the evidentiary hearing. (ECF No. 253). A continuance was granted on September 3, 2021, and the evidentiary hearing was reset for December 8, 2021. (ECF No. 254).

On October 7, 2021, Lemmon filed a motion seeking to obtain the audio recording of his jury trial. (ECF No. 255). The Government filed its response in opposition on October 12, 2021. (ECF No. 256). An Order denying the motion was entered on October 19, 2021. (ECF No. 257).

An evidentiary hearing was held on December 8, 2021. (ECF No. 259). Three witnesses appeared and testified for the Government: John Wesley Hall, Jr. (trial counsel); Tyler Benson (sentencing counsel); and Sammi Wilmoth (appellate counsel). Amy Rankins ("Rankins") (Lemmon's girlfriend at the time of his trial) appeared as a witness and testified for Lemmon. Lemmon also appeared in person and testified on his own behalf.

## II. DISCUSSION

"A prisoner in custody under sentence ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear

appropriate." 28 U.S.C. § 2255(b). A thorough review of Lemmon's motion, the files and records of this case, and the evidence presented at the evidentiary hearing, conclusively shows that Lemmon is not entitled to § 2255 relief, and the denial and dismissal of Lemmon's § 2255 motion with prejudice is recommended for the reasons discussed below.

### A.    Timeliness

"A motion by a federal prisoner for postconviction relief under 28 U.S.C § 2255 is subject to a one-year time limitation that generally runs from 'the date on which the judgment of conviction becomes final.'" *Clay v. United States*, 537 U.S. 522, 524 (2003) (citing 28 U.S.C. § 2255(f)(1)). To start the clock on a § 2255 limitations period, a conviction becomes final "when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction." *Clay v. United States*, 537 U.S. at 524-25. "The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate." U.S. Sup.Ct. R. 13.3.

Here, the Court's Judgment was entered on June 22, 2017. (ECF No. 177). Lemmon filed a notice of appeal on June 29, 2017. (ECF No. 184). On May 3, 2018, the Eighth Circuit Court of Appeals filed its Opinion affirming Lemmon's conviction and sentence. *United States v. Lemmon*, 720 F. App'x 822 (8th Cir. 2018) (ECF No. 202-2). Lemmon filed a petition for rehearing on May 14, 2018, which was denied on June 21, 2018. (Order, *United States v. Lemmon*, No. 17-2457 (8th Cir. June 21, 2018)). The Eighth Circuit's Mandate issued on June 28, 2018. (ECF No. 202). Lemmon's time to file a petition for a writ of certiorari with the United States Supreme Court expired September 19, 2018, which is 90 days after the Eighth Circuit denied his petition for rehearing. Lemmon did not file a petition for a writ of certiorari. Thus, Lemmon's

conviction became final on September 19, 2018, giving him one year from that date, or until September 19, 2019, to file a motion under § 2255. Lemmon filed his § 2255 motion on September 24, 2019, which is five days outside the one-year limitation period to file a timely motion.

In a reply to United States' response to Lemmon's § 2255 motion, attorney Self conceded that the § 2255 motion was filed after the deadline. (ECF No. 217, p. 1). He explained that he misunderstood the statute of limitations, thinking that the 90-day limitations period to file a petition for a writ of certiorari ran from the issuance of the Eighth Circuit's Mandate (instead of the denial of Lemmon's motion for rehearing), and that he miscalculated the due date for Lemmon's § 2255 motion based on that misunderstanding. He further stated that "[n]othing about this mistake can be attributed to Lemmon," and he requested application of equitable tolling. (*Id.*, pp. 2-3).

Because both parties agree, and the record confirms, that Lemmon's § 2255 motion is untimely, the question is whether the doctrine of equitable tolling applies. Equitable tolling, while available to a § 2255 movant, applies only when "an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary." *Byers v. United States*, 561 F.3d 832, 836 (8th Cir. 2009) (citing *United States v. Martin*, 408 F.3d 1089, 1093 (8th Cir. 2005)). An attorney's negligence or mistake does not generally constitute an "extraordinary circumstance" that would support equitable tolling. *Id.* Further, such extraordinary circumstances must not be attributable to the petitioner, must be "beyond a prisoner's control," and "the petitioner must also demonstrate he acted with due diligence in pursuing his petition." *Id.* (citations omitted). The use of equitable procedures should be infrequent, *Flanders v. Graves*, 299 F.3d 974, 976 (8th Cir. 2002), as "[e]quitable tolling is an exceedingly narrow window of relief," *Maghee v. Ault*, 410 F.3d 473, 476 (8th Cir. 2005). A petitioner asserting a right to equitable tolling bears the burden of

establishing applicability of the doctrine. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

Lemmon asserts that equitable tolling overcomes the untimeliness of his § 2255 motion based on the extraordinary circumstance of counsel's mistake in calculating the limitation period. Lemmon does not, however, demonstrate that counsel's behavior was so egregious, so outrageous, or so incompetent that it rose to the level of an "extraordinary circumstance." As just noted above, an attorney's mere negligence or mistake does not generally constitute an "extraordinary circumstance" that would support equitable tolling. *Byers*, 561 F.3d at 836. While Lemmon asserts that nothing about this miscalculation of the limitations period could be attributed to him, this alone does not establish that counsel's behavior constituted an "extraordinary circumstance" that would support equitable tolling. Rather, Lemmon simply argues that counsel misunderstood the legal standard when he miscalculated the deadline to file Lemmon's § 2255 motion; in other words, counsel made a mistake. Similar facts were presented in *Byers*, where the petitioner miscalculated the one-year limitation period, mistakenly thinking it began to run from the date his sentence was reduced under Fed. R. Crim. Pro. 35(b). *Id.* at 834. Byers relied primarily on *United States v. Martin*, *supra.*, but in *Martin* the movant's attorney "consistently lied about the filing deadline for a § 2255 motion, repeatedly lied about the status of the case, refused to communicate with the movant, and failed to file any documents regarding the § 2255 motion with the court." *Id.* at 836. In denying equitable tolling in *Byers*, the Eighth Circuit found "no allegation of deceit, misrepresentation, or other serious misconduct on the part of his attorney that prevented Byers from timely filing his § 2255 motion." *Id.* Such are the circumstances in the instant case, involving only Self's mistake in calculating the deadline for filing Lemmon's § 2255 motion, but no other egregious, outrageous, or serious misconduct on his part. The undersigned does not find that such

garden variety attorney error constitutes an "extraordinary circumstance" sufficient to warrant the "exceedingly narrow window of relief" of equitable tolling.

Further, Lemmon has not shown due diligence in pursuing his § 2255 claims in a timely manner. He has demonstrated his ability to file motions pro se throughout the pendency of this case. Lemmon has even demonstrated his ability to file motions independently while he was represented by counsel. There are no allegations or proof that Lemmon was prevented by circumstances beyond his control from filing a timely § 2255 motion on his own. He could have done so. He did not.

For the reasons just discussed, the doctrine of equitable tolling does not salvage Lemmon's untimely § 2255 motion. While Lemmon's motion is barred as untimely, his motion would also fail on the merits even if it had been timely filed.

## B.    Legal Standard for Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases." *Id*. at 688. Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question

counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

The *Strickland* standards apply to Lemmon's claims against his trial counsel, sentencing counsel, and appellate counsel. This Report and Recommendation will address Lemmon's claims against each counsel in turn. At the outset, we do not find Lemmon to be a credible witness. In his pleadings to this Court and in his testimony at the evidentiary hearing, Lemmon repeatedly made incomplete or misleading statements. He would state his ignorance of a fact or principle, but his previous pleadings demonstrated his knowledge of that fact or principle. When confronted with this discrepancy, Lemmon denied writing the pleading despite admitting that he signed and submitted it to the Court.

### C. Lemmon's Ineffective Assistance of Counsel Claims

#### 1. Trial Counsel – John Wesley Hall, Jr.

Lemmon first asserts deficient representation by trial counsel, John Wesley Hall, Jr., and

he raises five issues to support his claim: (a) conducting only four face-to-face visits with Lemmon prior to trial; (b) failing to contact and call witnesses on a witness list provided by Lemmon and Rankins; (c) failing to obtain video surveillance from the Arkansas Welcome Center where certain offense conduct took place; (d) failing to obtain DNA and fingerprint forensic testing of the firearms used as evidence at trial; and (e) stipulating to the legitimacy of the voluminous telephone records presented by the Government at trial.  (ECF No. 209, pp. 3-8).

### a.   Four In-Person Visits Prior to Trial

"The adequacy of counsel cannot be determined solely on the basis of the amount of time he spent interviewing his client." *Lupo v. United States*, 435 F.2d 519, 523 (8th Cir. 1970).  A petitioner must show prejudice from counsel's alleged failure to investigate or consult with him by demonstrating the existence of evidence that counsel could have discovered through further investigation or by producing exculpatory information the petitioner could have conveyed to counsel through additional consultations. *Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997).  A petitioner must also demonstrate that the purported undiscovered evidence would have been sufficient to undermine confidence at trial. *Payne v. United States*, 78 F.3d 343, 348 (8th Cir. 1996).

First, Lemmon has failed to establish that four face-to-face visits with his trial counsel in preparation for trial was deficient representation.  Testimony at the evidentiary hearing by Hall, Rankins, and Lemmon confirm that there was much more communication between Hall and Lemmon, including through Rankins at Lemmon's direction, in addition to the face-to-face visits. Hall met with Lemmon on two occasions at the Sebastian County Adult Detention Center in Fort Smith, Arkansas, to discuss the Superseding Indictment, alleged co-conspirators, and, at their

second meeting, a plea offer from the Government.  There was no discovery available during these first two meetings.  Hall testified that he reviewed all the discovery with Lemmon page-by-page during their third meeting, which took place at the Scott County Detention Center in Waldron, Arkansas.  Hall testified that he spent five hours with Lemmon, asking about each name, the alleged events, how they might rebut the Government's evidence, and whether there was additional information.  Hall testified that he and Lemmon spoke together for the entire visit; that he answered Lemmon's questions if he could; and that Lemmon provided possible defenses and witnesses.  At the fourth meeting, Hall sought clarification of information Lemmon had previously provided and went over the discovery materials again.  Lemmon asserted at the evidentiary hearing that Hall fell asleep and slept at the table in front of him for 20 minutes during this visit.  Hall testified that he did not fall asleep during this meeting.  (ECF No. 259).

As the number and length of visits does not determine the effectiveness of representation, we do not find Hall's representation deficient simply because Lemmon believes in hindsight that four face-to-face visits did not sufficiently prepare them for trial.  Lemmon has not established that he could have provided exculpatory information sufficient to undermine confidence at trial if Hall had consulted with him more often or for a longer time each visit.  Thus, Lemmon's first claim against Hall fails.

### b.  Failing to Contact or Call Witnesses

Second, Lemmon has failed to show that Hall was deficient in his representation by failing to contact and call witnesses on a witness list provided by Lemmon and Rankins.  At the evidentiary hearing, Hall testified that he discussed the witness list both with Lemmon and with Rankins.  After these discussions, Hall determined that most of the witnesses on the list were

character witnesses. Hall thus made the strategic decision not to pursue testimony from these character witnesses as their testimony would necessitate Lemmon's testimony, and Lemmon chose not to testify at trial. (ECF No. 126, p. 1; ECF No. 192-2, pp. 469-470). Based on his training and experience, Hall also understood that the risk of putting on character witnesses in Lemmon's defense would greatly outweigh any possible benefit. Character witness testimony would expose these witnesses to cross examination from the Government, which would likely successfully discredit character testimony with "Did you know" and "Were you aware" type questions. (ECF No. 259).

At the evidentiary hearing, Lemmon testified at length about everyone on the witness list, including the contact information he had for witnesses, what their testimony would have been, and how their testimony could have affected the outcome of his trial. Lemmon admitted that many of the witnesses on the list were character witnesses. He admitted that he did not have a last name for at least two of the witnesses; that he did not have addresses or phone numbers for all the witnesses; and that he had not been in contact with at least one of the witnesses for 10 years at the time of his trial. He also admitted that he did not have affidavits or statements from any of these witnesses as to what they would have testified to at trial. He conceded that he did not know whether they would have agreed to testify if Hall had contacted them. He further admitted that he did not know how the trial would have been different had these witnesses testified. (ECF No. 259). Lemmon testified, for example, that John Davenport Spencer ("Spencer"), who was a witness named on the list, would have testified on Lemmon's behalf that he was innocent of the offense conduct and that Spencer's testimony would have changed the outcome of the trial. However, when presented with Spencer's written plea agreement naming Lemmon as part of the

conspiracy for which Spencer was charged, Lemmon conceded that Spencer might not have testified on Lemmon's behalf at trial. (ECF No. 259).

Lemmon has shown neither deficient performance nor prejudice resulting from Hall's strategic decision not to contact or call to testify at trial individuals on the witness list provided by Lemmon and Rankins, and this claim of ineffective assistance of counsel fails.

### c. Failing to Obtain Arkansas Welcome Center Video

Third, Lemmon has not met his burden to show deficient representation by Hall for failing to obtain video surveillance from the Arkansas Welcome Center, where certain offense conduct took place. Lemmon insists that had Hall obtained the video surveillance, it would *not* have shown his presence at the Welcome Center, thereby proving that he was not guilty of that offense conduct and likely changing the result of the trial. Essentially, Lemmon faults Hall for failing to obtain video surveillance, that might not even exist, to prove a negative—that Lemmon was *not* where the Government says he was.

Hall testified that not enough information was available to him to obtain the relevant video surveillance. He stated there was no specific date given for the dry-run meeting at the Welcome Center, so he would have had to request video surveillance for a period of up to 30 days. Further, he did not know what vehicles were used during the dry-run, and thus he would not know what to look for in the video. Finally, he did not know which camera, if any, would have had the correct angle to capture the relevant events. Hall determined there was just not enough information available for him to request, obtain, and review the video surveillance from the Welcome Center. Hall also indicated he had experience with such video surveillance evidence, and that such evidence was transient, being recorded over or deleted after some period, and that even if relevant

video ever existed, it certainly did not exist by the time Hall came to represent Lemmon.  Thus, Hall made the strategic decision not to request, obtain, and review the video surveillance from the Welcome Center, and instead, he felt the better approach was to point out that the Government had not done so, and that the lack of such evidence satisfies reasonable doubt for a jury.  (ECF No. 259).  It is apparent to the Court that Hall carefully considered the facts and information available to him concerning any video surveillance from the Welcome Center, and it cannot be said that his strategic decision not to request the video surveillance constituted deficient performance.

Moreover, even if Hall had attempted to obtain the video surveillance from the Welcome Center, Lemmon has not offered any evidence as to how the outcome of his trial would have been different.  Lemmon admitted during the evidentiary hearing that it was possible the video evidence never existed at all; that if it did exist at some point in time, that it no longer existed by the time the investigation began; and that it was very likely it no longer existed by the time Hall came to represent Lemmon.  Thus, Lemmon has not shown how Hall's decision not to pursue this video prejudiced him.

Having established neither deficient performance nor prejudice related to Hall's strategic decision not to seek out the video surveillance from the Arkansas Welcome Center, this claim against Hall lacks merit.

### d.  Failing to Request DNA and Fingerprint Testing on the Firearms

Fourth, Lemmon's argument regarding Hall's decision not to obtain DNA and fingerprint forensic testing of the firearms used as evidence at trial also fails.  Lemmon contends that Hall should have pursued forensic testing to again prove a negative—that Lemmon had *not* handled the firearms.

Hall testified that his training and experience had taught him that pursuing fingerprint evidence on firearms rarely if ever benefits defendants because even transitory fingerprints could be present and would be heavily detrimental to a defendant's case. Further, Hall testified that he personally contacted the head of the forensic testing center to inquire about procedures regarding DNA testing on firearms. Hall stated he was informed that that the testing center did not conduct such testing as a matter of course because such testing was so unreliable that it provided little value to investigations. Again, transitory DNA might be found on firearms, which would not necessarily prove that a defendant handled a firearm. Thus, based on the substantial risk that forensic testing would result in false positives, Hall made the strategic decision not to pursue forensic testing of the firearms. Instead, Hall made the argument that the Government failed to obtain such DNA or fingerprint evidence to implicate Lemmon, and that the absence of such evidence was enough to create reasonable doubt for a jury. (ECF No. 259).

Regarding the prejudice prong of the *Strickland* test, Lemmon conceded during his testimony at the evidentiary hearing that the outcome of his case would not necessarily have been different because he admitted the testing could have resulted in positive identification, false or otherwise. Thus, Lemmon has not shown how he was prejudiced by Hall's decision not to pursue forensic testing of the firearms.

No deficient performance or prejudice having been shown by Lemmon on this issue, the claim fails.

### e. Telephone Records Stipulation

Fifth, Lemmon has failed to show that Hall's representation was deficient based on his decision to stipulate to the legitimacy of the voluminous telephone records presented by the

Government at trial. At the evidentiary hearing, Hall testified that his training and experience as a defense attorney has taught him that foundational witness testimony for business records is boring for a jury and that "a bored jury convicts." Hall also testified that he believed bringing witnesses in to lay foundation for hundreds of pages of business records would give the jury the impression that the records were of heightened importance. As Hall knew these records to be detrimental to Lemmon's defense, Hall made the strategic decision to stipulate to the authenticity of the records to avoid lengthy foundational witness testimony, to avoid boring the jury, and to avoid giving more import to business records that were already detrimental to Lemmon's defense. (ECF No. 259). Lemmon has offered nothing to undermine the soundness of this strategic decision.

Even if Hall had not stipulated to these records, Lemmon could not articulate how the outcome of his trial would have been different. The documents had seals of authenticity and, thus, they would have been admitted regardless of Hall's stipulation.

Hall's representation of Lemmon was neither legally deficient nor prejudicial under the *Strickland* standards, and his claims of ineffective assistance of counsel against Hall are without merit and should be denied.

### 2. Sentencing Counsel – Tyler Benson

Lemmon next asserts deficient representation by sentencing counsel, Tyler Benson, and he raises two issues to support his claim: (a) failing to review the final PSR with Lemmon prior to the sentencing hearing, and (b) failing to properly state objections to the PSR that were overruled at sentencing for being non-specific and vague. (ECF No. 209, pp. 8-11). Lemmon has not only failed to establish that Benson's representation was deficient, but he also fails to show how he was

prejudiced by the alleged deficient representation.

Vague and conclusory allegations are not sufficient to state a ground for relief under 28 U.S.C. § 2255. *Hollis v. United States*, 796 F.2d 1043, 1046 (8th Cir. 1986). A petitioner must allege what, if any, prejudice he suffered based on counsel's alleged deficient performance. Lemmon does not. We note a non-binding but persuasive case on point, out of the Eastern District of Virginia, which states that spending just a few minutes prior to the sentencing hearing reviewing a PSR is not deficient representation. *Baires v. United States*, 707 F.Supp.2d 656, 669 (E.D. Va. 2010). Further, a petitioner's Sixth Amendment right to effective assistance of counsel is not abridged when the petitioner instructed his counsel to pursue a course of action for which he later complains. *United States v. Wellington*, 417 F.3d 284, 289 (11th Cir. 2005).

### a. Failure to Review Final PSR Prior to Sentencing

Lemmon contends that Benson did not review the final PSR with him before the sentencing hearing on June 21, 2017. Upon the Court's inquiry at the sentencing hearing, Lemmon stated that he had not reviewed the final PSR. (ECF No. 192-2, p. 533). Benson then advised the Court that he had reviewed the initial PSR with Lemmon, "we made revisions," and he reviewed the final PSR with Lemmon "after the revisions were made." (*Id.*). The Court was satisfied with Benson's explanation and proceeded with the sentencing. Lemmon was ultimately sentenced to 420 months, a downward variance from the Guidelines sentence of life imprisonment. (ECF Nos. 177, 178).

At the evidentiary hearing, Benson testified that he spent several minutes with Lemmon the morning of the sentencing hearing to confirm that two of the changes to the initial PSR Lemmon had requested had been made in the final PSR. Benson testified in detail about Lemmon's specific concern with two items reported in the initial PSR – that he was not married

to a Ms. Forester, and about the amount of debt he owed. On the morning of the sentencing hearing, Benson confirmed that those two items had been revised according to Lemmon's wishes, and that Lemmon expressed satisfaction with the results. (ECF No. 259).

We have considered Lemmon's testimony on this issue at the evidentiary hearing, and we do not find it credible. Lemmon testified that Benson did not review the final PSR with him. When presented with his own affidavit, stating that Benson *had* reviewed the final PSR with him, Lemmon denied that he had written that line of the affidavit despite signing it and filing it with the Court. Lemmon then testified that Benson showed him the final PSR but did not hand him the paper copy before the sentencing hearing. (ECF No. 259).

Moreover, and fatal to his claim, Lemmon has not suggested, let alone shown, how his sentencing would have been any different had Benson spent more time reviewing the final PSR with him.

### b. Vague Objections to the Initial PSR

Second, Lemmon has failed to show deficiency and prejudice based on Benson's objections to the initial PSR. Lemmon instructed Benson to object to every item in the initial PSR regarding his offense conduct, as Lemmon maintained his innocence after being convicted by the jury. Benson did so. This necessarily involved making blanket objections to the numerous paragraphs of the initial PSR that set forth Lemmon's reported offense conduct. At the sentencing hearing, the Court ruled that Benson's blanket objections to those items were too vague as they did not state any specific legal or factual basis to support the objections. We are hard pressed, however, to find how else Benson could have objected to the reported facts of Lemmon's offense conduct. As the Court noted at sentencing, "the Court heard all of the evidence at trial, … in which the jury

convicted him of the two counts, and the Court has heard sufficient testimony at that trial to meet the government's preponderance of the evidence burden as to the facts set forth in the offense conduct section of the [PSR]." (ECF No. 192-2, pp. 546-47). Lemmon has not stated how Benson should have objected to the items in the offense conduct section of the PSR, nor has he shown how the result of his sentencing would have been different had Benson done so.

Benson's representation of Lemmon at sentencing was not deficient or prejudicial under the *Strickland* standards, and Lemmon's claims of ineffective assistance of counsel against Benson should be denied.

### 3. Appellate Counsel – Sammi Wilmoth

Lemmon also asserts ineffective assistance of counsel by his appellate counsel, Sammi Wilmoth, and he raises two issues to support his claim: (a) failing to allow Lemmon to conduct his own comparison of the trial transcript to the trial audio recording, and (b) failing to advise him of the deadline to seek certiorari after the denial of his appeal. (ECF No. 209, p. 12). Neither of these claims have any merit and they should be denied.

When a claim is meritless, counsel cannot be ineffective under *Strickland* for failing to raise it on appeal. *See Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996); *Thomas v. United States*, 951 F.2d 902, 904 (8th Cir. 1991). Additionally, due process does not grant the right to counsel for a litigant seeking to file a petition for a writ of certiorari to the United States Supreme Court. *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008). Where there is no constitutional right to counsel, a § 2255 ineffective assistance claim cannot succeed. *Id*.

### a. Comparison of the Official Trial Transcript to the Backup Trial Audio

First, Lemmon's claim that Wilmoth's representation was deficient because she failed to

obtain and allow him to conduct a comparison of the official trial transcript with the court reporter's backup audio recording of his trial is meritless. Lemmon claims that Wilmoth failed to find the discrepancy he says existed between the official trial transcript and the court reporter's backup audio recording, and that she failed to argue that such a discrepancy existed on appeal. At the evidentiary hearing, however, Lemmon conceded that he does not have a right to the court reporter's backup audio recording of the trial, and that Wilmoth did all she could have done to find the alleged error when she listened to the portion of the trial audio Lemmon directed her to and compared it to the official trial transcript, finding no discrepancy and no inappropriate statements by the Court. (ECF No. 259). Thus, Wilmoth's representation cannot be deficient based on the failure to bring this frivolous claim.

### b. Failure to Advise of Deadline to File Petition for Writ of Certiorari

Lemmon's claim that Wilmoth's representation was deficient based on her failure to advise him of the deadline to file a petition for a writ of certiorari also fails. Lemmon fails to offer any authority upon which to base his claim that Wilmoth had a duty to advise Lemmon of this deadline. Further, Lemmon has not shown that had Wilmoth advised him of the deadline he would have filed a timely petition, that the Supreme Court would have granted him a writ of certiorari, and that he would have prevailed on his claims at the Supreme Court.

Lemmon has shown neither deficient performance nor prejudice under *Strickland* in connection with Wilmoth's representation of Lemmon on appeal, and his claims of ineffective assistance of counsel against Wilmoth should be denied.

### D. No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C.§ 2253 only if the applicant has

made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present. *Slack v. McDaniel*, 529 U.S. 473 (2000). Lemmon has not made a substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

### III.    CONCLUSION

For the reasons and upon the authorities discussed above, it is recommended that Lemmon's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 208), as supplemented, be **DISMISSED with PREJUDICE**.

It is further recommended that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of May 2022.

/s/  *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE